UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| VIOLA M. JOHNSON, )<br>)<br>    Plaintiff,  )<br>)<br>vs.   )<br>)<br>MICHAEL ASTRUE Commissioner of the )<br>Social Security Administration,   )<br>)<br>    Defendant.  ) | No. 1:11-cv-01074-SEB-TAB |

**ENTRY**

Viola Johnson ("Johnson") seeks judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  See 42 U.S.C § 416(i), 423(d).

To be eligible for DIB, a claimant must prove she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  To establish disability, the plaintiff is required to present medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques.  A physical or mental impairment must be established

1

by medical evidence consisting of signs, symptoms, and laboratory findings, not only by a claimant's statement of symptoms." 20 C.F.R. §§ 416.908; 404.1508.

The Social Security Administration ("SSA") has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. 20 C.F.R. §§ 404.1520 and 416.924. If disability status can be determined at any step in the sequence, an application will not be reviewed further. Id. At the first step, if the claimant is currently engaged in substantial gainful activity, then she is not disabled. At the second step, if the claimant's impairments are not severe, then she is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.924(c). Third, if the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the SSA has pre-determined are disabling. 20 C.F.R. § 404.1525. If the claimant's impairments do not satisfy a Listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations. 20 C.F.R. §§ 404.1545 and 416.945. At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled. Fifth, considering the claimant's age, work experience, and education (which are not considered at step four), and her RFC, she will not be determined to be disabled if she can perform any other work in the

relevant economy.  The claimant bears the burden of proof at steps one through four, and at step five the burdens shifts to the Commissioner.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).  The task a court faces in a case such as this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision is supported by substantial evidence and otherwise is free of legal error.  Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993).  "Substantial evidence" has been defined as "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)).

On February 28, 2007, Ms. Johnson filed an application for DIB alleging disability since January 24, 2007.  Her application was denied initially and on reconsideration, so she requested a de novo hearing before the ALJ, which was approved and the hearing held on May 12, 2009.  Her claim was denied on June 17, 2009, and on February 8, 2011, the Appeals Council denied Ms. Johnson's request for review.  R. at 1.  On July 28, 2011, the Appeals Council again denied Ms. Johnson's request for review, making the ALJ's decision the Commissioner's final decision and the one we review here.  R. at 6.  See 20 § C.F.R. 422.210(a).  Ms. Johnson then initiated this civil action on November 21, 2011.

On May 12, 2009, a video administrative hearing was held before the ALJ, during which Ms. Johnson, who was represented by counsel, testified.  R. 88-105.  At step one of the sequential evaluation process, the ALJ found that Ms. Johnson had not engaged in substantial gainful activity since her alleged onset date.  At step two, the ALJ found that

3

Ms. Johnson suffered from the severe impairment of chronic low back pain. At step three, the ALJ found that Ms. Johnson does not have an impairment or combination of impairments that either meets or medically equals any of the conditions in the Listing of Impairments.

The ALJ found that Ms. Johnson has the RFC to perform work at the light exertional level, as defined in 20 C.F.R. § 404.1567(b). R. at 77. Specifically, the ALJ found that Ms. Johnson can lift, carry, push, and pull up to 20 pounds occasionally, 10 pounds frequently, stand for 4 hours in an 8 hour workday, walk for 4 hours in an 8 hour workday, and sit for 6 hours in an 8 hour workday. R. at 73. However, Ms. Johnson is unable to perform work that requires more than occasional stooping or bending, nor that which requires any climbing of ladder, ropes, and scaffolds. R. at 77. At step four, the ALJ found that Ms. Johnson is capable of performing past relevant work, which was as an intake worker. See D.O.T. #195.107-010. The ALJ did not reach step five due to his step four determination. Therefore, the ALJ found that Ms. Johnson was not disabled and not entitled to benefits. R. at 81. Ms. Johnson asserts several errors with the ALJ's decision.

Ms. Johnson, who was born in 1953, was 56 years old at the time of the ALJ's decision. R. 187. She testified that she had last worked as an intake worker in 2007, but had also worked as a home health aide. R. at 92-94, 155. However, the ALJ did not consider this work as a home health aide because Ms. Johnson's reported earnings from that job did not eclipse the amount that presumptively constitutes substantial gainful activity. R. at 70.

**Evidence**

**Initial psychological examinations**.  On August 30, 2006, Aldo Buonanno, MD, gave Ms. Johnson an Initial Psychiatric Assessment.  R. at 270-72.  Ms. Johnson presented the problems of stress, anxiety, and depression, and Dr. Buonanno noted that Ms. Johnson's behavior had become more erratic in the 1-1/2 months prior to the examination due to Ms. Johnson's separation from her husband.  R. at 270.  In terms of Ms. Johnson's medical history, Dr. Buonanno noted only that she has had no seizures and needed some cosmetic dental work.  R. at 270.  Dr. Buonanno referred Ms. Johnson to a therapist at Alpine Clinic and prescribed her twice daily Seroquel after diagnosing her with Adjustment Disorder with Depression and Anxiety, allergy to Keflex, and marital problems.  R. at 272.  By October 16, 2006, Dr. Buonanno cleared Ms. Johnson to return to work "without restrictions."  R. at 274.

**Chiropractic examinations**.  On March 21, 2007, Steven Meeks, DC, reviewed a subjective report submitted by Ms. Johnson and then wrote a letter describing the medical treatment Ms. Johnson had gotten from his office.  R. at 355.  Ms. Johnson's subjective report was memorialized in a "Neck Pain Disability Index Questionnaire," where Ms. Johnson noted that, among other things, she could only lift very light weights, could not sit for more than one hour, and could not stand for more than a half hour without her pain increasing.  R. at 367.  Ms. Johnson noted that all of her subjective limitations had manifested over the "course of years" after a car accident in 2004.  R. at 368.

After reviewing Ms. Johnson's Questionnaire, Dr. Meeks noted that Ms. Johnson had been released from her 2004 car accident injuries in January 2005.  R. at 355.  The

release exam revealed improvement of Ms. Johnson's low back condition, but noted that Ms. Johnson did have some residual spinal problems that required intermittent supportive care to maintain spinal stability. R. at 355. Dr. Meek's letter also documented that Ms. Johnson reported that she sometimes had "trouble with [her] lower back pain and/or weakness upon some daily activities and repetitious bending at the waist, stopping, pushing, pulling or lifting objects over 10-15 pounds." R. at 355.

**Further psychiatric examinations**. On March 30, 2007, at the Agency's request, Dr. Buonanno performed a consultative examination on Ms. Johnson to determine the impact of her mental condition on her ability to engage in work related activities. R. at 407-11. Dr. Buonanno noted that Ms. Johnson had never started the Lexapro that her treating physician, Thomas Anderson, MD, had prescribed to her. R. at 409. Among other details, this report also noted that Ms. Johnson did some cooking, light cleaning, and would go to the grocery store if a friend was with her. R. at 410. Ms. Johnson confirmed that she did laundry, but could not carry a heavy load. R. at 410. Dr. Buonanno then diagnosed Ms. Johnson with an adjustment disorder with mixed anxiety and depressed mood, back pain, hypertension, fatigue, elevated cholesterol, left leg and feet numbness, coldness in feet and hands, "medical problems," pain, difficulty lifting, bending, carrying, and pushing. R. at 411.

**Physical examination by Dr. Perrin**. On April 5, 2007, Jean Perrin, MD, performed a consultative examination on Ms. Johnson. R. at 383-88. Under "History of Present Illness," Dr. Perrin noted that Ms. Johnson had never received a "definitive diagnosis" and that Ms. Johnson wasn't taking any pain medication, but that she would

6

take a Tylenol if she was "really uncomfortable." R. at 383. In her examination, Dr. Perrin found that Ms. Johnson "ambulated with a normal gait, which is not unsteady, lurching, or unpredictable." R. at 384. Dr. Perrin concluded that Ms. Johnson "should be able to work 8 hours a day in a seated, standing or ambulatory position. She should be allowed to move about frequently and at will. Claimant should not do repetitive lifting." R. at 387.

**Physical examinations by Dr. Anderson**. Dr. Anderson, Ms. Johnson's primary care physician, authored two reports in 2007 that are of particular relevance to our analysis here. The first one, from May 22, 2007, states that, among other restrictions, Ms. Johnson should not lift over five pounds, should not sit longer than 2-3 hours at a time, and should not stand longer than 2-3 hours at a time. R. at 478. In the second report, from June 20, 2007, Anderson states that Ms. Johnson should only stand for 15 minutes at one time and should only sit for 30 minutes at one time. R. at 399. This June report also states that Ms. Johnson can work four hours per day. Id.

**Further chiropractic examinations**. Ms. Johnson continued to treat her back pain with Dr. Meeks approximately once a month for the remainder of 2007 and 2008, but missed several appointments. R. at 422-40. A January 4, 2008, Ms. Johnson had an MRI done of her lumbar spine. R. at 480-86. Jeffrey Crecelius, MD, reviewed the MRI results on February 29, 2008 and told Ms. Johnson that her condition may or may not systematically improve depending on other factors, including compliance with Ms. Johnson's exercise program and smoking cessation. R. at 487.

**Physical examinations by Dr. Yoon**.  Ms. Johnson's primary care physician, Dr. Anderson, passed away in late 2008.  Ms. Johnson then went to I.T. Yoon, MD, for treatment of her back problems.  Ms. Johnson informed Dr. Yoon that she had been experiencing lower back pain since 2000 and that it had radiated to her left lower leg.  R. at 510.  On February 27, 2009, an Ultrasound Doppler was performed of Ms. Johnson's lower extremities.  The evaluation was normal.  R. at 513.

Later, on March 3, 2009, Ms. Johnson returned to Dr. Yoon to request a needed form for disability.  R. at 505.  Dr. Yoon found that Ms. Johnson had "mild" diffuse tenderness over her lower back, and that although Ms. Johnson reported that she had not been able to work for the past two years because of her back pain, Dr. Yoon recorded that Ms. Johnson walked "good" and was able to get up and down from the exam table "good."  R. at 509.

## Discussion

Ms. Johnson contends that the ALJ made the following legal errors: (1) relying on a defective hypothetical question to the vocational expert for the ALJ's step four decision; and (2) finding that Ms. Johnson could sit for uninterrupted periods of two hours and was therefore able to continue her past work as an intake worker.  We address these arguments in turn.

**I.**     **The ALJ's Reliance on the Hypothetical Question Posed to the Vocational Expert for the ALJ's Step Four Decision**

Ms. Johnson argues that, by asking the vocational expert to assume, as relevant to his argument that claimant was able, "as a minimum but not necessarily restricted to" a

full range of unskilled work, (R. at 101), the ALJ asked and relied on a defective question when coming to his step four decision. Ms. Johnson argues that the hypothetical question is unreviewable because it specified the minimum, but not the maximum, she could do in terms of the mental demands of work skills. Ms. Johnson argues that because the ALJ didn't define the minimum she could do, it is not clear that she could perform the job of intake worker, as that occupation requires a claimant to perform skilled work per the Dictionary of Occupational Titles (DOT). R. at 28.

Ms. Johnson's argument on this point is unpersuasive. When interacting with the vocational expert, the ALJ will often pose a series of hypothetical questions to the expert prior to determining the claimant's RFC. The ALJ may include more or less restrictions in these hypothetical questions than he ultimately finds. See, e.g., Simila v. Astrue, 573 F.3d 503, 521 (7th Cir. 2009); Young v. Barnhart, 362 F.3d 995, 1003 (7th Cir. 2004). In order for the vocational expert's testimony to constitute substantial evidence, the ALJ must include all of the claimant's *impairments* in the hypothetical question. See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir.1999) (superseded by statute on other grounds as recognized in Leonard v. Astrue, 487 F. Supp. 2d 1333 (M.D. Fla. 2007)). However, the hypothetical question is not required to list all of the claimant's medical *conditions*. See Webb v. Commissioner of Soc. Sec., 368 F.3d 629, 633 (6th Cir. 2004).

Here, although the disputed hypothetical question referenced certain mental impairments, the ALJ's resulting RFC included only physical impairments. R. at 73-74. The ALJ concluded that Ms. Johnson's mental impairments caused no more than minimal limitations on her ability to function. R. at 71-72. Thus, even when inelegantly-phrased,

9

the fact that one of the ALJ's hypothetical questions did not specify the precise amount of mental demands Ms. Johnson could undertake in the workplace is irrelevant because the ALJ's RFC finding containing only physical and no mental impairments is consistent with his Step Four finding.

## II.  The ALJ's Finding that Ms. Johnson Could Sit For Uninterrupted Periods of Two Hours

Ms. Johnson argues that in determining that she could sit for uninterrupted periods of two hours, the ALJ erroneously rejected consultative examiner Dr. Perrin's opinion about moving about frequently and at will.  Pl.'s Br. at 6.  Ms. Johnson also argues that the ALJ erroneously evaluated treating physician Dr. Anderson's opinions about uninterrupted sitting.  Ms. Johnson further argues that the ALJ's conclusions were not supported by substantial evidence in the record.  Id. at 7.

In coming to his conclusion, the ALJ examined multiple physicians' reports, some of which he noted conflicted with one another.  The three reports specifically at issue in this case are: (1) Dr. Perrin's Internal Medical Examination, dated April 5, 2007 (R. at 383-88); (2) Dr. Anderson's Release to the Indiana Department of Workforce Development, dated May 22, 2007 (R. at 478-79); and (3) Dr. Anderson's Medical Statement Regarding Low Back Pain for Social Security Disability Claim, dated June, 20 2007.  R. at 398-99.

Each of the abovementioned reports contained its own findings.  Dr. Perrin's report concluded with an assessment that Ms. Johnson "should be able to work 8 hours a day in a seated, standing or ambulatory position.  She should be allowed to move about

frequently and at will. Claimant should not do repetitive lifting." R. at 387. Among other designations, Dr. Anderson's checked a box on his May 2007 Release noting that Ms. Johnson should not sit or stand longer than two to three hours at a time. R. at 478. However, this Release did not state how many hours Ms. Johnson should work in a day. On his June 2007 Statement, Dr. Anderson circled the options concluding that Ms. Johnson should only work four hours a day, sit for only 30 minutes at a time and stand for only 15 minutes at a time. R. at 399. Because he perceived that these reports were inconsistent with other evidence in the record, the ALJ gave them "little weight." R. at 80.

In particular, the ALJ took issue with: (1) the differences between Dr. Anderson's May and June 2007 opinions regarding the amount of time Ms. Johnson could sit uninterrupted and (2) the differences between Dr. Anderson's and Dr. Perrin's June 2007 opinions regarding the length of work day that Ms. Johnson could endure. R. at 79. Ms. Johnson argues that the ALJ erroneously rejected Dr. Perrin's report as inconsistent. Pl.'s Br. at 6.

The difference between Dr. Anderson's May and June 2007 opinions regarding the length of time Ms. Johnson could sit uninterrupted is important because of its implications for Ms. Johnson's ability to perform work as an intake worker. Per the vocational expert in this case, an intake worker would have the option to sit or stand for a few minutes at a time. R. at 102. However, the vocational expert also noted that being able to stand for only 15 minutes, sit for only 30 minutes, and work only four hours is inconsistent with full time employment. R. at 103. Ms. Johnson argues that Drs.

11

Anderson and Perrin's reports conclude that she could not sustain the prolonged periods of standing and sitting that "sedentary" work requires. R. at 250. Thus, Ms. Johnson argues that she could not perform her job as an intake worker "as generally performed," and the ALJ should have moved on to step five. R. at 250.

The ALJ does not adequately explain why he chose the earlier opinion of Dr. Anderson, Ms. Johnson's treating physician, over Anderson's later, more precise opinion. The ALJ's stated rationale was limited to his statement that "[a]s portions of Dr. Anderson's medical opinions are not consistent with the other evidence of record, nor with one another, I have assigned them little weight in this case, insofar as they are inconsistent with the residual function capacity given above." R. at 79. Despite the ALJ's reference to "little weight" given to both Dr. Anderson's May and June 2007 opinions, it appears from the rest of the ALJ's opinion that he in fact adopted Dr. Anderson's May 2007 opinion in rendering his decision. The ALJ does not provide sufficient explanation for his conclusion that Dr. Anderson's two opinions are inconsistent with one another. See R. at 79. In his opinion, the ALJ did not clearly explain the analysis he used to reach his conclusion other than to simply state that the reports were "not consistent." Id. Thus, a more complete explanation from the ALJ is required.

In addition to a lack of explanation regarding the basis for the ALJ's reliance upon the earlier, less precise medical opinion of Dr. Anderson's two reports, the ALJ has failed to provide sufficient explanation as to why he found Dr. Perrin's opinion to be inconsistent with the May 2007 opinion from Dr. Anderson, the report that the ALJ

12

ultimately adopted.  See R. at 383-88; R. at 478-79.  The form on which Dr. Anderson checked "No sitting [or standing] longer than 2-3 hours at a time" does not include an option for a shorter duration of time.  See R. at 478.  The ALJ appears to assume that this form's two to three hour designation does not capture the lesser-included time periods reflected in Dr. Anderson's June 2007 opinion.  However, the ALJ did not explicitly state that he made this inference, nor does he explain his rationale.

Further explanation is also needed for the inconsistency that the ALJ perceived between Dr. Anderson's June 2007 opinion and Dr. Perrin's opinion regarding the length of time that Ms. Johnson could work per day.  Dr. Anderson's June 2007 opinion states that Ms. Johnson could work a four-hour day.  R. at 399.  Dr. Perrin opines that Ms. Johnson could work an eight-hour day.  R. at 387.  However, the ALJ does not reconcile the condition added by Dr. Perrin, which is that in order to work an eight-hour day, Ms. Johnson must be able to "move about frequently and at will."  This limitation appears to indicate that Ms. Johnson would need to get up from her desk and walk around during those eight hours rather than merely having the opportunity to stand up and sit down while still being confined at her desk.  See id.  Dr. Anderson's June 2007 opinion similarly states that Ms. Johnson "need[s] to change position more than once every two hours."  R. at 399.  Without further elaboration by the ALJ on this point, it is unclear whether the ALJ considered whether Drs. Anderson and Perrin could have agreed on the number of hours Ms. Johnson could work.

We therefore conclude that the ALJ's analysis lacks a logical bridge between his decision to adopt certain medical evidence and to discredit other evidence in the record.

13

It is true that an ALJ may choose to give more weight to a treating physician's opinion than to other physicians' reports, and also that an ALJ may reject a treating physician's report for inconsistencies.  See Halloran v. Barnhart, 362 F.3d 28, 31-32 (2nd Cir. 2004).  However, even if there are sound reasons for refusing to give a treating source's assessment controlling weight, the ALJ is nevertheless required to determine what value the opinion *does* merit.  Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011) (citing id.; Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010)).  The Commissioner's attempts to do this in its Memorandum are simply post hoc rationalizations.  See Def.'s Mem. at 6.

### III.   Conclusion

For the foregoing reasons, the denial is REVERSED and the case is REMANDED to the agency for reevaluation consistent with this entry.

> IT IS SO ORDERED.

Date: 09/28/2012

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

J. Frank Hanley , II
lauras@jfrankhanley.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov